***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and oral arguments of the parties with reference to the errors assigned by defendant. Defendant has not shown good grounds to reconsider the evidence, to receive further evidence or to rehear the parties or their representatives. Accordingly, the Full Commission AFFIRMS with modifications, the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following stipulations of the parties: *Page 2 
 STIPULATIONS
1. All parties have been correctly designated, and there is no question as to misjoinder or non-joinder of parties.
2. All parties are properly before the Industrial Commission; the Industrial Commission has jurisdiction over the parties and the subject matter; this case is subject to the North Carolina Workers' Compensation Act; and the parties are bound by and subject to the North Carolina Workers' Compensation Act.
3. An employment relationship existed between the plaintiff and the defendant at the time of injury on November 5, 2008, relevant to this claim.
4. Plaintiff's average weekly wage is $474.60, which yields a workers' compensation rate of $316.40.
5. Plaintiff alleges he sustained an injury by accident to his neck, back and right shoulder arising out of and in the course of his employment with defendant on November 5, 2008.
6. The compensability of the plaintiff's November 5, 2008 claim has been denied by the defendants by way of filing a Form 61 on December 29, 2008.
7. The parties stipulated the following exhibits into evidence: Stipulated Exhibit 1, Pre-Trial Agreement; Stipulated Exhibit 2, Plaintiff's Responses to Defendants' Discovery; Stipulated Exhibit 3, Plaintiff's Medical Records and Industrial Commission Forms and Filings.
 *********** ISSUES
The issues in contention are: *Page 3 
1. Did plaintiff sustain a compensable injury by accident arising out of and in the course of his employment with defendant to his neck, back or right shoulder on November 5, 2008?
2. To what temporary total disability benefits, if any, is plaintiff entitled? 3. To what permanent partial disability benefits, if any, is plaintiff entitled?
4. To what medical compensation, if any, is plaintiff entitled?
5. To what, if any, further benefits is plaintiff entitled under the North Carolina Workers' Compensation Act?
6. If plaintiff is entitled to disability benefits under the Act, is defendant entitled to a credit under N.C. Gen. Stat. § 97-42 for short or long term disability benefits received by plaintiff?
 ***********
Based upon the foregoing Stipulations and the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner in this matter, plaintiff was 53 years old with a date of birth of March 15, 1956.
2. Plaintiff has been employed with the Food Lion Distribution Center in Salisbury, North Carolina since 2005 as a forklift operator.
3. On March 31, 2007, plaintiff sustained a compensable injury by accident to his low back. Plaintiff's March 31, 2007 injury is not the subject of this claim. Plaintiff was temporarily totally disabled from work from March 31, 2007 to September 2008. Plaintiff returned to work in September 2008 to perform duties in the "Temporary Alternative Duty" *Page 4 
(TAD) program with Food Lion. Plaintiff performed various tasks while involved with the TAD program and did not perform his former job duties as a forklift operator.
4. Plaintiff was released to return to full-duty work on October 6, 2008 and resumed his position as a forklift operator.
5. At the Food Lion Distribution Center, the aisles are separated according to different food items. For example, aisles M1 and M2 contain chicken; aisle M4 contains the heaviest meats; and aisles M5 and M6 contain luncheon meats. When plaintiff returned to full-duty work on October 6, 2008 he was assigned to aisles M5 and M6. The heaviest box on those two aisles weighed approximately 35 pounds.
6. Between October 6, 2008 and November 5, 2008, plaintiff only worked on aisles M5 and M6. On November 5, 2008, he was asked to assist Mark Pinion, a co-worker and forklift operator, on aisle M4, which contained the heaviest meats at the Distribution Center.
7. Plaintiff testified that on the evening of November 5, 2008, he was attempting to lift and place a box of hamburger meat on top of a stack of boxes. The stack of boxes was over five feet tall. Plaintiff is five feet, four inches tall. The box plaintiff was lifting and stacking weighed approximately 100 pounds. Due to the weight of the box and the height of the stack, plaintiff had to heave the box off of his chest get it to the top of the five feet tall stack. While lifting the box off of his chest to place it on top of the stack, plaintiff felt a pull or tear in his left shoulder/left neck area.
8. Plaintiff told Mr. Pinion that he had injured his shoulder and Mr. Pinion responded that he should not have been assigned to aisle M4 because he had just returned to work and the box was too heavy for plaintiff. Mr. Pinion completed the rest of the work on aisle M4 that evening. Plaintiff went to Jose Ramirez, the supervisor on duty on the evening of *Page 5 
November 5, 2008, and explained to him what had happened to his shoulder when lifting the 100-pound box of hamburger meat.
9. Prior to his injury of March 31, 2007, plaintiff was never assigned to one particular aisle. However, since the inception of his employment with Food Lion in 2005, it was never a normal part of plaintiff's job duties to lift 100-pound boxes. Between March 31, 2007 and November 5, 2008, plaintiff had never worked on aisle M4.
10. Plaintiff called Kay Chapman, an adjuster for defendant's servicing agent regarding his November 5, 2008 injury. Ms. Chapman informed plaintiff that she would contact Dr. O. Del Curling, the physician with which plaintiff had treated regarding his injury of March 31, 2007, and would schedule an appointment for plaintiff for his neck and left shoulder. Plaintiff asked Ms. Chapman if he should remain out of work until the appointment with Dr. Curling. Ms. Chapman advised him that she would not pay him to sit at home and that he needed to go back to work.
11. Plaintiff testified that it was his understanding that Ms. Chapman never scheduled the appointment with Dr. Curling. Despite informing Mr. Ramirez and Ms. Chapman of his injury of November 5, 2008, defendant never informed plaintiff where he should seek medical treatment.
12. After November 5, 2008, plaintiff returned to work for three weeks. His left arm and neck area hurt so badly that his left arm began to go numb. Plaintiff could not even steer the forklift. On November 10, 2008, plaintiff presented to his primary care physician at Medical Associates of Davie. It was noted by the nurse practitioner that plaintiff was required to lift 100-pound objects and that he had reinjured his back. Further, it was noted in the medical records that *Page 6 
plaintiff felt he needed to rest his injury since his regular job required lifting about 35 to 40 pounds.
13. During the deposition of Dr. Joel Edwards, counsel for both parties discovered that there was an additional note called the nursing assessment and a handwritten note, which were not produced by Medical Associates of Davie when the medical records were requested. Therefore, these notes were not a part of the stipulated medical records.
14. Regarding the nursing assessment and handwritten note of November 10, 2008, Dr. Edwards testified that Ms. Cindy Calcutt, a licensed practical nurse, with his practice, had the following notations in her records based upon information provided by plaintiff: "heavy lifting at work November 5th and 6th. Complaints of back pain. Discuss note for work." Dr. Edwards testified that it was fair to say, based upon that note, that plaintiff related the reason for his visit on November 10, 2008 to some lifting that occurred at work on November 5 and 6, 2008.
15. Plaintiff returned to Medical Associates of Davie on November 14, 2008 and December 9, 2008. On December 9, 2008 it is noted that plaintiff presented to the clinic with "complaints of pain in the left side of his neck and his left shoulder that has been going on for about month now. He feels like it is gradually getting worse. He notes when he tries to use his left upper extremity at different times it will go numb." The note further indicated that plaintiff had to leave work on December 8, 2008 due to increased pain and he could not sleep the previous night because of pain. An MRI was ordered of plaintiff's cervical spine and he was written out of work for December 9 and 10, 2008.
16. Plaintiff was referred to physical therapy, which made his symptoms worse instead of better, according to plaintiff. On January 5, 2009, a medical note from Medical *Page 7 
Associates of Davie indicated that after having spoken with the physical therapist and plaintiff, the medical provider recommended a referral to Orthopedic Specialists of the Carolinas.
17. Plaintiff presented to Dr. John E. Ritchie of Orthopedic Specialists of the Carolinas on January 13, 2009. Dr. Ritchie noted that plaintiff presented with problems related to his left shoulder and "was well until November 5, 2008 when he was apparently injured at work. He was returning from long term treatment of back problems and apparently was placed in an area of the company where he had to lift 90 pounds of meat in boxes that were stacked at shoulder height." Dr. Ritchie also noted that plaintiff had left arm numbness which was thought to be related to his cervical spine. Dr. Ritchie's impression as of January 13, 2009 was "(1.) Neck pain; and (2.) Left shoulder pain with impingement."
18. Dr. Ritchie assigned light-duty restrictions of no lifting more than 10 pounds and recommended an MRI of plaintiff's left shoulder. Plaintiff presented the note to Tim Overcash, a supervisor at Food Lion, and Mr. Overcash instructed plaintiff to turn the note in to Ms. Chapman. Plaintiff testified that at no point since November 5, 2008 has anyone from Food Lion informed him that light duty positions were available.
19. On January 19, 2009, after having reviewed the MRI scan of plaintiff's left shoulder, Dr. Ritchie opined that plaintiff had a full thickness tear of his left rotator cuff and that his neck was still bothering him. As such, Dr. Ritchie recommended a spine center evaluation to maximize treatment for plaintiff's cervical spine and if he showed improvement in his neck, Dr. Ritchie would proceed with surgery on the left shoulder.
20. On February 2, 2009, plaintiff presented to Dr. David R. O'Brien, also with Orthopedic Specialists of the Carolinas for the cervical spine evaluation. Dr. O'Brien noted that plaintiff's neck pain on a scale of 0-10 was a 3 and that his left shoulder symptoms were more *Page 8 
severe. Dr. O'Brien also noted that plaintiff had occasional numbness and tingling down into the left arm. Dr. O'Brien reviewed the December 9, 2008 MRI of plaintiff's cervical spine and opined that plaintiff had a normal cervical MRI except for a mild degenerative disc bulge at C6-7. Considering that plaintiff's symptoms appeared to Dr. O'Brien as being more isolated to the shoulder than radicular in nature, Dr. O'Brien recommended that plaintiff continue treatment with Dr. Ritchie regarding his left shoulder.
21. On February 24, 2009 Dr. Ritchie recommended rotator cuff surgery. Plaintiff's rotator cuff repair surgery was originally scheduled for March 11, 2009; however, because he had a stent placement in June 2008, he medically needed to wait one full year before another procedure could be performed. Therefore, surgery was rescheduled until June 15, 2009.
22. On June 15, 2009, Dr. Ritchie performed an arthroscopic left shoulder rotator cuff repair, a distal clavicle excision and a subacromial decompression on plaintiff.
23. As of the date of Dr. Ritchie's deposition on August 12, 2009, he had not released plaintiff to return to full-duty work.
24. Plaintiff testified that the pain in his neck has remained and that he would like medical treatment for his neck pain.
25. Mark Pinion has worked for Food Lion for three years as a forklift driver. Mr. Pinion testified that he and plaintiff worked in the same warehouse for the three years prior to plaintiff's injury on November 5, 2008. Mr. Pinion testified that he was assigned to and worked for approximately two years on the "M4 aisle," the aisle that contained the heaviest meats. Mr. Pinion testified that he considered the M4 aisle to be the heaviest aisle in the warehouse.
26. According to Mr. Pinion, plaintiff was considered an "extra lift driver" when he returned to full-duty, which meant that plaintiff was not assigned to just one aisle and would *Page 9 
cover the section that needed extra coverage. Mr. Pinion testified that plaintiff did not run the M4 aisle on a regular basis and that he only knew of one other time prior to November 5, 2008 when plaintiff had worked on the M4 aisle. Mr. Pinion recalled that there was only one other time that plaintiff worked on that aisle prior to November 5, 2008 because plaintiff had communicated to management that the boxes were too heavy and it hurt him to lift the boxes. Mr. Pinion testified that management "did keep him out from over there for a while," until the night of November 5, 2008 when they assigned him to the M4 aisle.
27. On November 5, 2008, Mr. Pinion was present when plaintiff was injured. Mr. Pinion observed plaintiff on the M4 aisle, lifting and dropping a pallet of hamburger meat down on the rack to go on the slots. The cases were approximately five feet high and Mr. Pinion stated that he remembered plaintiff lifting and telling him that he had hurt himself and that he needed to go to the office and report it. Plaintiff told Mr. Pinion that he had injured his shoulder and that his arm and hand had begun to go numb. Mr. Pinion told plaintiff that he agreed he needed to report the injury right away.
28. Mr. Pinion stated that plaintiff went to the office and reported the injury and then came back and informed him that he was going to see if he could work a little while longer because "they" asked if he could try to stay because they were shorthanded that evening. Mr. Pinion testified that plaintiff reported the injury to the supervisor "Jose" that evening.
29. Mr. Pinion told plaintiff that he did not want him to pick anything else up because he was hurting. He told plaintiff that he would pick everything up for him. Approximately an hour after the injury, plaintiff came to Mr. Pinion and told him that he was hurting badly and that he did not believe he was going to be able to finish the shift. *Page 10 
30. Timothy Overcash has been employed with Food Lion for 21 years and has held the position of "lead shipping supervisor" for the past 10 years. Mr. Overcash was familiar with plaintiff and knew that he was a forklift driver. Mr. Overcash was aware of plaintiff's workers compensation injury of March 31, 2007, but was not aware plaintiff had sustained an injury on November 5, 2008.
31. Mr. Overcash agreed that Jose Ramirez was a supervisor in November 2008 and would have been an appropriate person for plaintiff to report an injury. Mr. Overcash testified that lifting cases of product in the warehouse would not have been a normal part of plaintiff's job duties. Further, Mr. Overcash testified that in the fall of 2008, "after being out for so long, there were people that were, I guess, what you might have call primary, so to speak, in areas. So he probably came back in and did an awful lot of floating initially." Mr. Overcash was of the opinion that Mr. Pinion would be "a lot more familiar" regarding the weight of boxes on the M4 aisle than he would be.
32. The Full Commission finds as fact that the testimony of plaintiff, Mr. Pinion and Mr. Overcash is credible.
33. Plaintiff's assignment to aisle M4 on November 5, 2008 introduced new conditions into his employment. He had previously lifted 90 to 100 pound boxes only once previously in the history of his employment with defendant. Plaintiff's usual job duties involved lifting of up to approximately 35 pounds. Prior to March 31, 2007, when plaintiff sustained a compensable back injury that is not the subject of this claim, he did not work on aisle M4, the heaviest aisle at the plant. Plaintiff was out of work as a result of his March 31, 2007 injury until September 2008 and he worked light duty until October 6, 2008. When plaintiff was returned to full-duty work he was assigned as an "extra lift driver" which meant he was required to work any *Page 11 
aisles assigned; however, he had only worked aisles M5 and M6 where the heaviest box weighed 35 pounds, until November 5, 2008. Plaintiff even had difficulty handling the lighter, lifting duties as documented in the November 10, 2008 medical note by the nurse practitioner at Medical Associates of Davie. Plaintiff had not done the heavy lifting sometimes required in his new assignment long enough for it to become a part of his normal work routine. Plaintiff had not become accustomed to and had not gained proficiency in lifting boxes weighing 90 to 100 pounds above shoulder level at the time of his injury.
34. Plaintiff sustained an injury by accident arising out of and in the course of his employment on November 5, 2008 as a result of new conditions of employment that he was assigned. At the time of plaintiff's injury, he had not performed these new conditions long enough to gain proficiency or become accustomed to the substantial increase in the weight he was required to lift on November 5, 2008. These new conditions of employment assigned to plaintiff on November 5, 2008 constituted an interruption of plaintiff's work routine and the introduction of unusual conditions likely to result in unexpected consequences.
35. Dr. Ritchie reviewed and considered the fact that plaintiff had a pre-existing rotator cuff tear prior to November 5, 2008. Based upon a reasonable degree of medical certainty, Dr. Ritchie opined that the mechanism of plaintiff's injury of November 5, 2008 materially aggravated his pre-existing tear to the point that it became symptomatic. Plaintiff is entitled to medical compensation with respect to his left shoulder injury as may reasonably be required to effect a cure, give relief or lessen the period of his disability.
34. In addition to the injury to his left shoulder, the evidence establishes that plaintiff sustained an injury to his neck arising out of and in the course of his employment as a direct result of a specific traumatic incident of the work assigned to him by defendant. *Page 12 
35. Plaintiff is still having pain in his neck. Dr. O'Brien opined that lifting a 90-pound box is the type of activity that can cause pre-existing cervical degenerative disc disease to become symptomatic. Dr. O'Brien opined that if plaintiff's shoulder was treated and his neck pain did not improve, then you could assume that it is possible that the disc bulge was causing him his neck pain, but it may not be. He explained that, "really, the only test, which is not a perfect test, would be cervical discography, to inject different disks and see if that one in particular reproduces his neck symptoms."
36. Defendant is obligated to provide such medical treatment for plaintiff's shoulder/neck that is reasonably required to effect a cure, provide relief, or lessen the period of his disability. Defendant is also obligated to reimburse plaintiff for all medical expenses related to his November 5, 2008 injury.
37 Plaintiff is entitled to temporary total disability compensation from December 9, 2008 through the present and continuing, until further order of the Industrial Commission. On December 9-10, 2008, plaintiff was written out of work by his medical provider. Thereafter, on January 5, 2009 plaintiff was referred to Dr. Richie who assigned restrictions of lifting no more than 10 pounds on January 13, 2009. These restrictions continued in effect until March 11, 2009 when Dr. Richie determined that plaintiff was totally unable to work. Plaintiff made a reasonable effort to return to work for defendant while the restrictions of lifting no more than 10 pounds were in place.
38. Plaintiff has received short-term disability benefits through a disability plan fully funded by defendant.
 *********** *Page 13 
Based upon the foregoing Stipulations and Findings of Fact the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of employment to his left shoulder on November 5, 2008 and also an injury to his neck at the same time as a direct result of a specific traumatic incident of the work assigned, when he felt pain in his left shoulder and left neck area as he was lifting a 100-pound box of hamburger. N.C. Gen Stat § 97-2(6).
2. To be compensable under the Workers' Compensation Act, an injury must result from an accident arising out of and in the course of employment. N.C. Gen Stat § 97-2(6). An accident under the Workers' Compensation Act is defined as "(1) an unlooked for and untoward event which is not expected or designed by the injured employee; (2) a result produced by a fortuitous cause."Harding v. Thomas and Howard Co.,256 N.C. 427, 428, 124 S.E.2d 109, 110-111, (1962). If an employee is injured as a result of performing his regular duties in the usual and customary way, there is no accident. Porter v. Shelby Knit,Inc., 46 N.C. App. 22, 264 S.E.2d 360 (1980). An accidental cause will be inferred, however, when an interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences occurs. Gunter v. DaycoCorporation, 317 N.C. 670, 673, 346 S.E.2d 395, 397 (1986), quoting Harding v. Thomas Howard Co.,256 N.C. 427, 429, 124 S.E.2d 109, 111 (1962).
3. "New conditions of employment to which an employee is introduced and expected to perform regularly do not become a part of an employee's work routine until they have in fact become routine." Gunter v. DaycoCorporation, 317 N.C. 670, 675, 346 S.E.2d 395, 398 (1986). *Page 14 
The Supreme Court of North Carolina in Gunter looked at the definition of "routine" from Webster's Third New Int'l Dictionary (1979) and further held that new conditions of employment cannot become an employee's "regular course of procedure" or "established sequence of operations" until the employee has gained proficiency in performing in the new employment and has become accustomed to these new conditions. Id.
4. Plaintiff has established that on November 5, 2008 he suffered an injury by accident arising out of and in the course of his employment with defendant to his left shoulder. N.C. Gen. Stat. § 97-2(6). The greater weight of the evidence establishes that at the time of his injury, plaintiff's new working conditions had not become part of his usual work routine. Plaintiff had not gained proficiency in performing the heavier lifting of 90 to 100 pound boxes of meat (instead of his usual job requirements of lifting up to 35 pounds) at heights above his shoulder as was required when working on aisle M4 and had not become so accustomed to these lifting conditions for the job to have become a part of his normal work routine. Gunter v. Dayco Corporation,317 N.C. 670, 675, 346 S.E.2d 395, 398 (1986). According to the testimony of plaintiff, Mr. Pinion and Mr. Overcash, which the Full Commission has found credible, it was "unusual" and "not normal" for plaintiff to work on aisle M4, the aisle that contained the heaviest meats. Moreover, plaintiff had only worked on this aisle on one prior occasion; he had only been medically released to work full-duty work approximately one month prior to his injury and the medical evidence documents that he was having problems trying to lift the lighter weights of 35 pounds.
5. On November 5, 2008 plaintiff also sustained an injury to his neck as a direct result of a specific traumatic incident of the work assigned as a result of lifting a 90 to 100 pound box of hamburger. A specific traumatic incident need not involve unusual conditions or *Page 15 
departure from the claimant's normal work routine. Lettly v. TrashRemoval Service, 91 N.C. App. 625, 372 S.E.2d 747 (1988). A claimant's injury is the result of a specific traumatic incident if it occurs at a cognizable period of time. Bean v. Floyd's CreekBaptist Church, 99 N.C. App. 767, 394 S.E.2d 1919 (1980).
6. As a result of his compensable injury, Plaintiff is entitled to temporary total disability benefits in the amount of $316.40 per week from December 9, 2008 and continuing until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
7. In order to support a conclusion of disability, the Industrial Commission must find that an employee was incapable, after his injury, of earning the same wages he had earned before his injury in the same employment, that the employee was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and that the employee's incapacity to earn wages was caused by his injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). Plaintiff has established his incapacity to work in any employment, after March 11, 2009, as he was written out of work by his medical provider on that date. Plaintiff has further established temporary total disability from December 9, 2008 through March 11, 2009. On December 9 and 10, 2008, plaintiff was written out of work by his medical provider. Thereafter, on January 5, 2009, plaintiff was referred to Dr. Richie who assigned restrictions of lifting no more than 10 pounds on January 13, 2009. These restrictions continued in effect until March 11, 2009 when Dr. Richie determined that plaintiff was totally unable to work. Plaintiff made a reasonable effort to return to work for defendant while the restrictions of lifting no more than 10 pounds were in place. Therefore, plaintiff has met his burden of proving he has been temporarily and totally disabled since December 9, 2009.Id. *Page 16 
8. Plaintiff is entitled to payment of all medical expenses related to his November 5, 2008 injury by accident to his neck and left shoulder which are or have been reasonably required to effect a cure, provide relief, or lessen the period of his disability, including out-of pocket expenses he incurred. N.C. Gen. Stat. §§ 97-2(19); 97-25.
9. Defendant is entitled to a credit for short-term disability benefits paid to plaintiff. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fee hereinafter approved, defendant shall pay to plaintiff temporary total disability benefits in the amount of $316.40 per week from December 9, 2008 and continuing until further order of the Industrial Commission.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of treatment for the compensable injury to his left shoulder and neck for so long as such treatment may reasonably be required to effect a cure, provide relief, or lessen the period of disability, including out-of-pocket expenses plaintiff incurred, according to procedures approved by the Industrial Commission.
3. Defendant shall receive a credit for short-term disability benefits paid to plaintiff.
4. A reasonable attorney's fee of 25 percent of the compensation due plaintiff under Paragraph 1 of this Award is approved for plaintiff's counsel, payable as follows: plaintiff's counsel shall receive 25 percent of any accrued compensation owed to plaintiff and every fourth check thereafter. *Page 17 
5. Defendant shall pay the costs.
This the ___day of April 2010.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER